Filed 2/11/15  P. v. Tischler CA5

NOT TO BE PUBLISHED IN THE OFFICAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>THOMAS JAMES TISCHLER,<br><br>　　　Defendant and Appellant. | F067844<br><br>(Super. Ct. No. CRF39255)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Eric L. DuTemple, Judge.

Brian R. Chavez-Ochoa for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Darren K. Indermill, Deputy Attorneys General for Plaintiff and Respondent.

-ooOoo-

Thomas James Tischler was convicted of one count of making a criminal threat (Pen. Code, § 422).[1]  He represented himself at trial.  He now argues that the court erred

---

[1]Subsequent statutory references are to the Penal Code unless noted otherwise.

by not conducting a mental competency hearing to determine whether he should be allowed to continue representing himself after disclosing facts about his medical condition to the court. He also argues that the court erred in excluding and admitting certain items of evidence. We will affirm.

### FACTS AND PROCEDURAL HISTORY

The district attorney filed a criminal complaint charging Tischler with violating section 422 by threatening, on or about August 17, 2012, to commit a crime against Robin Ballard that would result in great bodily injury or death. The complaint was deemed an information on February 19, 2013.

At trial, Robin Ballard (referred to throughout the record as Bob) and his wife Deborah Ballard described the incident of August 17, 2012, and events leading up to it. In March 2011, Tischler sold the Ballards property located on Italian Bar Road in Tuolumne County. They paid Tischler $76,000 down, plus $12,000 for the first two years of payments. They were then to pay Tischler $500 per month for 20 years, beginning in March 2013. There was to be no interest charged on the loan. The sale contract included an agreement that Tischler could remain on the property until December 31, 2011, during which time he would remove his personal property. On the property were three structures: an A-frame house, a cabin, and a fifth-wheel trailer. The contract allowed Tischler to occupy the A-frame house until December 31, 2011, but he instead agreed to move into the trailer and allow the Ballards and their two grandsons to move into the house. The Italian Bar Road property was the scene of all the subsequent occurrences.

A few months after the sale, according to the Ballards, Tischler began trying to find a way to get the property back. He often came to the property to harass the Ballards and yell at them. The Ballards called the sheriff's department, but the location was remote and Tischler was usually gone by the time deputies arrived.

The Ballards testified that on October 12, 2011, Tischler appeared on the property and began an argument with Bob about a pickup truck. Deborah's brother-in-law owned

the truck. Earlier, the brother-in-law had made an agreement with Tischler according to which the brother-in-law would do some mechanical work on a truck owned by Tischler and Tischler would obtain a registration and smog check for the brother-in-law's truck. Instead of carrying out his side of the deal, Tischler falsified paperwork and caused the brother-in-law's truck to be registered in Tischler's name. In the meantime, the brother-in-law had moved to Oklahoma and left the truck behind. When he came to the property on October 12, 2011, Tischler demanded the brother-in-law's truck. Tischler, Bob, and Deborah's nephew Danny argued heatedly. Deborah called Tischler over to try to calm him down. Tischler ran toward her, calling her names. Danny ran over and told Tischler not to talk to his aunt that way. Tischler said, "F you, I'll do what I please," and pushed Danny. Danny and Tischler fought. Tischler ended up on the ground, where he took pictures of himself and threatened to sue. Having been injured, Tischler went to the hospital that day. From there, he repeatedly sent text messages to Deborah, saying he would get the property back and the Ballards would be homeless. Deborah estimated that Tischler sent her more than 75 text messages that day.

The next confrontation took place on October 31, 2011. Tischler arrived at the property and came to the main house to ask the Ballards for a decorative item, a glass thermometer, that he had left in the kitchen. Deborah gave it to him and he asked if he could come in. Deborah said no. Tischler became angry, called Deborah names, and said he could go wherever he wanted because the property was his. Bob went outside and Tischler went back to his car. Tischler retrieved a crowbar from the car and hit Bob on the head with it. Bob ran up the steps to the porch, where he got an ax handle, which he used to fight Tischler. Bob and Tischler ended up in a field, with Tischler on top of Bob. Bob's nephew pulled Tischler off. Then Tischler went back to his car and drove away. Deborah called the sheriff's department.

The Ballards sought a restraining order against Tischler after this incident. Their request was denied.

3

On December 17, 2011, according to the Ballards' testimony, Tischler arrived at the property with several other men. They had an SUV and a moving van. Tischler removed a solar power generating system that supplied all the electricity to the property. He also took a water heater and a wood stove from the cabin, along with several propane tanks.

Tischler began attempting to remove the Ballards from the property by claiming they were in default under their sale contract with him. The contract required the Ballards to insure the property, but Tischler told Deborah not to worry about it, so she did not purchase a policy. In 2012, he told her she had to have insurance within a week or he would declare the Ballards to be in default. Deborah obtained a policy, but it was quickly canceled because, according to Deborah, Tischler told the insurance company they were "doing illegal drugs up there." Deborah bought a policy from another insurer, but the policy was again canceled because, Deborah claimed, Tischler called the insurer and demanded a policy limit of $1 million. Deborah claimed that she made multiple attempts to obtain insurance and that the attempts failed each time after Tischler contacted the insurance company. After this, Tischler came to the property repeatedly to post and serve notices of default.

Finally, the Ballards testified about the incident that led to the charges, which took place on August 17, 2012. Tischler came to the property with two men, Mike McMullen and Chad Benbow. Bob met Tischler on the stairs and Tischler again pressed papers on Bob, shouting that he was going to take the property back. The Ballards' grandson Tyler, who had brain damage and was mentally disabled, became agitated and ran down the steps and toward Tischler, shouting, "I'm going to get you, Tom." Deborah was worried that Tischler would hurt Tyler, so she took a pair of pruning shears and ran down to where Tischler and Tyler were, saying to Bob, "If he touches [Tyler], I'll get that mother fucker …." Deborah grabbed Tyler and the two of them went back up the stairs.

Bob, feeling frustrated with Tischler's repeated confrontations, put his shoes on and picked up the shotgun he kept by the door. He put the gun on his shoulder, went out

4

on the porch and told Tischler to leave the property. He did not point the gun at Tischler. Tischler replied by pointing to Benbow and saying, "[T]hat guy down there has got a gun and he's going to kill you. He's going to kill you." Bob saw the butt of Benbow's gun. He pointed his shotgun at Benbow and challenged Benbow to show his gun. He did not lower the shotgun from this shoulder or point it at anyone until after he heard Tischler's threat and saw Benbow's gun. Deborah and Bob testified that they feared they would be shot.

McMullen or Tischler made a video recording of the incident, which police officers viewed before deciding to arrest Tischler. The recording was played for the jury.

Deborah testified that the Ballards sold the property after this incident, in order to "get completely away from" Tischler. They sold it for the remaining amount they owed Tischler and took a loss.

Tischler called McMullen and Benbow as defense witnesses. McMullen worked as Tischler's personal attendant, helping him with his medical needs and his housework and yard work. In his telling, he went with Tischler to the property on August 17, 2012, to serve papers on the Ballards. He and Tischler tried to give papers to Bob and then went around the property taking pictures. Bob said, "I'm sick of this shit," and went inside. He came back out, and "[w]ithout saying anything," he "was holding a shotgun at us." Bob cocked the gun and said, "You guys need to f-ing leave." Then Tyler came out with his fists clenched and said, "I'm going to fucking kill you, Tom." Next, Deborah appeared with a pair of scissors and said, "I'm going to gut that mother fucker." (On cross-examination, McMullen admitted he did not know Deborah had scissors until later, when he was watching the video.) At this point, Tischler said, "There is a guy down there at another truck. He's going to shoot you if you don't put down that gun, Bob." Benbow was standing there with his arms crossed, but he did not actually have a gun. Bob walked away, and Tischler, Benbow, and McMullen got in their trucks and left. They were "a little upset" because they had "just had a shotgun pulled out on" them.

5

Tischler called the sheriff's department. Deborah rode up to them on a four-wheel, all-terrain vehicle and taunted them, saying "Ooooh, Ahhhh, I'm so scared."

Benbow testified that he heard Tischler and Bob arguing and saw Bob go in the house and come back out with a shotgun. Bob pumped the shotgun. He pointed it at Tischler and McMullen and then at Benbow. Benbow did not hear Tischler threaten Bob. Benbow's young stepson was in the truck. Benbow was not asked at trial whether he had a gun that day.

Although he represented himself at trial, Tischler did not testify in his defense.

During her cross-examination of McMullen, the prosecutor asked whether, earlier in the trial, he had tried to intimidate the district attorney's victim-witness advocate, Christine Miller, by blocking her as she climbed the steps of the courthouse. McMullen denied it, saying he was just trying to ask her a question.

The prosecutor called Miller as a rebuttal witness. She testified that she was assigned to assist the Ballards. The previous day, McMullen stepped in front of her as she was going up the stairs. When she tried to walk around him, he "mov[ed from] side to side" too, but finally let her pass. While this was happening, McMullen was "badgering" her "about hearing something." Tischler cross-examined Miller, asking her about an incident she witnessed the day before, in which Bob spoke to Benbow in the hallway. Miller said she heard part of that conversation and asked Bob to walk away from it.

Tischler called McMullen on surrebuttal. McMullen testified that he "accompanied" Miller up the stairs and asked her about the incident the day before. Miller said she could not talk to him. McMullen replied, "You saw what happened yesterday. Don't lie about it." Then he sat down. He denied blocking her path.

The jury found Tischler guilty as charged. The court suspended imposition of sentence and admitted Tischler to five years' probation, including one year in county jail. At the same time, the court issued a protective order requiring Tischler to keep away from the Ballards.

*DISCUSSION*

## I.    *Self-representation*

Immediately after the court granted Tischler's motion to represent himself, and at other points later in the trial, Tischler disclosed facts about his medical condition to the court. He argues that, because of these facts, the court should have reconsidered allowing him to represent himself. We disagree.

The facts on which Tischler relies are as follows: The court granted Tischler's motion to represent himself on May 6, 2013. As soon as it did so, Tischler informed the court that he expected to schedule surgery soon because he had an infection in his face where metal plates had been implanted in it. "I'm having my face rebuilt again because of the people I supposedly attacked," he said. The court moved the trial date up from July to June 2013 to accommodate the possible surgery and told Tischler he would have to file a motion for a continuance if there would still be a conflict.

Tischler said more about his injuries on the first day of trial, June 19, 2013. The court and parties were discussing a motion by the prosecution to admit some and exclude other evidence of prior incidents between Tischler and the Ballards. Tischler said that he was injured in the October 12, 2011 incident. He said he was the victim in that incident. "That crushed my face and it caused me a brain [hemorrhage]. I have—I have seven pieces of metal in my face now that my body is now rejecting because I have an auto-immune problem," Tischler told the court. After the surgery by which the metal was implanted, Tischler could no longer feel the right side of his face. He said he was permanently disabled as a result of these injuries.

The court directed the parties to submit in writing a synopsis of the prior incidents and why they were relevant. Tischler said, "I cannot write. I have a ton of medical conditions. So if I have to look at you with one eye, it's because I see double vision. I

7

see two of everything. The Ballards' attack have left me this way." The court allowed Tischler to submit his synopsis orally.

Later that day, when he was cross-examining Deborah, Tischler had difficulty asking a proper question about the dispute over the truck:

"Q. Why—why did you interject yourself if it was my truck then?

"A. We didn't. We just asked you to calm down. That's all we kept telling you.

"Q. But if I was just there to take the truck, why—why were you getting involved if it was my truck?

"A. We weren't involved, Tom. We were asking you to calm down. You were crazy that day.

"Q. I just came down from cutting wood.

"MS. KRIEG [i.e., the prosecutor]: Objection. Testifying.

"THE COURT: I'm going to sustain the objection. Remember, just ask questions. You can't testify at this point.

"MR. TISCHLER:

"Q. So when—I guess when we went down to the hill and Danny and we were all gathering in a big cluster there, you said I chased you back up the hill and came rushing up on you. [¶] Is that—I can't frame the question. I don't—I'm trying—I'm sorry, Judge. [¶] Where were—why were you coming—you say Bob was already involved in the altercation?

"MS. KRIEG: Objection. Misstates the testimony.

"THE COURT: Sustained."

At the end of the same day, the court gave Tischler an opportunity to argue a point he had raised earlier. Tischler said, "Because I'm not able to take notes, Your Honor, I don't recall what issue I wanted to raise." The court reminded him of the issue. Tischler made his argument, leading to a ruling by the court on the admissibility of evidence regarding a civil suit between Tischler and the Ballards.

8

On the third day of the trial, June 21, 2013, Tischler mentioned that he was taking some medications. He described them as "neuro medications for my compromised immune system" and said they control tremors. He showed them to the court. Finally, later that day, when asking about closing arguments, Tischler again told the court he could not write. He asked if he could print his closing statement from a computer and bring it with him. The court said yes.

During the trial, Tischler never claimed that any of these facts showed that he could not represent himself, and he never asked the court to reconsider its ruling granting his request for self-representation. Now, however, he contends that the court should, on its own motion, have recognized these facts as indicating a possible "mental disorder or developmental disability based upon the head trauma received by" him in the confrontation on October 12, 2011, when he was hospitalized. Tischler's argument is that, after hearing about Tischler's medical condition, the court should have concluded that Tischler's waiver of his right to counsel might not have been knowing and voluntary because he was not mentally competent, and it should have conducted a hearing on this subject before allowing Tischler to continue representing himself. He cites *People v. Powell* (1986) 180 Cal.App.3d 469, 481, in which the Court of Appeal stated that if a trial court grants a defendant's request for self-representation, but subsequently becomes aware of convincing evidence that the defendant lacks the mental capacity to make a knowing and intelligent waiver of the right to counsel, the court should reconsider whether to allow self-representation.

A criminal defendant who knowingly, intelligently, and voluntarily waives his or her right to counsel has a constitutional right to conduct his or her own defense. (*Faretta v. California* (1975) 422 U.S. 806, 807, 835-836.) "The test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1225.)

9

A defendant representing himself must be mentally competent to do so.  The federal Constitution allows a court to find that a defendant is not mentally competent to represent himself even though he is mentally competent to stand trial.  (*Indiana v. Edwards* (2008) 554 U.S. 164, 174; *People v. Johnson* (2012) 53 Cal.4th 519, 523.)  Competence to represent oneself is, at least, the ability "to carry out the basic tasks needed to present [one's] own defense without the help of counsel."  (*Edwards, supra*, at pp. 175-176.)  A trial court needs to inquire into the mental competence of a defendant seeking self-representation only if it is considering denying self-representation because of doubts about the defendant's mental competence.  (*Johnson, supra*, at p. 530.)  If it has such doubts, it may order a psychological or psychiatric evaluation, similar to the evaluation for competence to stand trial provided for in section 1369.  (*Johnson, supra,* at p. 530.)  The determination of whether a defendant is competent to represent himself is committed to the trial court's sound discretion and will not be disturbed on appeal absent a showing of abuse of discretion.  (*People v. McArthur* (1992) 11 Cal.App.4th 619, 627.)

The court did not abuse its discretion in not conducting a hearing on Tischler's mental competence to represent himself.  The court emphasized the dangers of self-representation and inquired into Tischler's education, noting that he attended some college classes and was certified as a diver and a dive instructor.  Tischler's courtroom performance in defending himself provided no reason to conclude that he might be mentally incompetent.  He cross-examined the prosecution's witnesses, called and examined his own witnesses, made evidentiary objections, and made opening and closing statements.  Our own examination of the record indicates that, in doing these things, Tischler did not appear overwhelmed or disoriented or incoherent.  He had the ability to carry out the basic tasks necessary for presenting a defense and did in fact carry them out.

The incidents and statements on which Tischler relies do not cast any doubt on his mental competence.  The instance in which he said he could not frame a question does not indicate any mental impairment.  It merely shows that, as a nonlawyer, Tischler was having difficulty asking a particular question in a way that was not subject to a valid

objection. Tischler asked witnesses hundreds of other questions during the course of the trial without any apparent difficulty apart from the difficulties inevitably encountered when an untrained person represents himself in court. He apparently had an impairment that prevented him from writing by hand, but he could write on a computer, so the impairment that prevented him from writing must not have been a mental one. None of his other remarks to the court about his medical condition indicated any mental impairment.

## II. *Evidentiary rulings*

Tischler argues that the trial court made several erroneous evidentiary rulings. In each instance, Tischler argues that the court erred in determining the relevance of evidence or in deciding whether the evidence was substantially more prejudicial than probative under Evidence Code section 352. These decisions were committed to the trial court's sound discretion and we cannot disturb them absent a showing of abuse of discretion. (*People v. Crittenden* (1994) 9 Cal.4th 83, 132; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

### A. *Further evidence of prior violence between Tischler and Bob Ballard*

Evidence of physical confrontations in October 2011 between Tischler and the Ballards or their relatives was presented to the jury, as discussed above. Tischler sought to introduce further evidence of these confrontations and injuries he sustained during them. He called his wife as a witness, and the prosecution asked for an offer of proof. Among other things, Tischler said his wife would testify about his injuries and his health, including the severe injuries to his face and head that resulted in his hospitalization and surgery after the incident on October 12, 2011. He argued that this evidence was relevant to the questions of whether he had reason to be afraid of the Ballards or was physically able to present a threat to them on August 17, 2012. Tischler also argued that the testimony would have impeached Bob, who said he had not observed any physical debility in Tischler. The court ruled that the proffered testimony was inadmissible under Evidence Code section 352.

11

Tischler now argues that this testimony would have supported a claim of self-defense. Tischler does not cite any authority supporting the proposition that self-defense is a defense to a section 422 charge, but we will assume for the sake of argument that it is. We will also assume that evidence of the severity of the injuries Tischler sustained on prior occasions could be relevant to the question of whether he experienced a reasonable fear of an imminent bodily injury (an element of self-defense) on August 17, 2012.

Nevertheless, no abuse of discretion has been shown. Contrary to Tischler's contention that "none of the past acts … became known to the jury," the jury did hear about the prior incidents and was free to draw conclusions from them about whether Tischler could reasonably fear the Ballards. The court could reasonably find that additional evidence in the form of details about Tischler's injuries would be substantially more prejudicial than probative.

Further, we would not reverse the judgment on these grounds even if we were persuaded that the trial court erred. An appellant has the burden of showing the appellate court not only error, but also prejudice. (*People v. Coley* (1997) 52 Cal.App.4th 964, 972.) Trial court error is prejudicial if there is a reasonable probability that, absent the error, the defendant would have obtained a better result in the trial court. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) For two reasons, we conclude that Tischler has not shown this.

First, the jury was not instructed on a defense of self-defense. The instruction defining the section 422 offense did state that "[t]he parties' history can also be considered as one of the relevant circumstances," but it did not state that the offense could be excused or justified by fear arising from facts about the parties' history. Tischler has not pointed to any place in the record indicating that he asked for a self-defense instruction, and he does not argue that the court was required to give such an instruction on its own motion. Since the jury was not instructed on the matter for which Tischler says the evidence was relevant, he cannot show a reasonable probability of a better outcome absent the alleged error.

Second, even if there had been a self-defense instruction, the viability of that defense would have depended on what the jury believed about the confrontation on August 17, 2012. Bob testified that he had the shotgun on his shoulder until Tischler threatened to have Benbow shoot him. Tischler's witnesses testified that Bob pointed the gun at them before that. It is not reasonably probable that knowing more about Tischler's injuries from prior incidents would have influenced the jury in deciding which version to believe.

Tischler also argues that his wife's testimony would have impeached testimony by Bob, who said he had not observed any physical debility in Tischler. The threat Tischler was charged with making, however, did not require any physical exertion on his part to be carried out: He threatened to have someone else shoot Bob. The court could, therefore, reasonably conclude that evidence of Tischler's physical debility was irrelevant to the charge and would be prejudicial in that it could improperly elicit the jury's sympathy. The court could further reasonably conclude that this prejudicial effect would substantially outweigh any potential impeachment impact on Bob's testimony.

Finally, Tischler contends that the court abused its discretion when it excluded defense exhibits 23 through 29, which were photographs of injuries he sustained in the prior encounters. The considerations discussed above apply to this evidence as well. The court could reasonably find that this evidence was substantially more prejudicial than probative under Evidence Code section 352, and Tischler has not shown a reasonable probability of a better outcome for him had the evidence been admitted.

### B.    *Real estate sale transaction documents*

The court rejected Tischler's proffer of a copy of the deed of trust recorded upon the sale of the property to the Ballards (defense exhibit 20), and a copy of the sale

contract for that transaction (defense exhibit 21). Tischler asserts now that this was an abuse of discretion.[2]

In the trial court, Tischler's argument in support of these documents was that they showed he had a right to be on the property on August 17, 2012, to serve a default notice; that he had a right to live on the property until December 31, 2011; and the right to remove personal property from the land. The court excluded the documents on the ground that they were not relevant.

In his appellate brief, Tischler does not make any argument about why these documents might have been relevant. He merely contends that they were "supported by testimony during the case in chief of the prosecution," by which he apparently means there was testimony to the effect that he sold the property to the Ballards, that a term of the agreement allowed him to remain on the property until December 31, 2011, and that the parties contemplated removal of personal property by him. He does not explain how the documents would have informed the jury about anything that was in dispute on these points or how the documents would otherwise have helped him. His claim on this point therefore has not been adequately briefed and we deem it forfeited. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2; *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324.)

### C.     *Marijuana agreement and dispute*

Tischler proffered evidence that there was an agreement under which the Ballards would grow marijuana for Tischler, and Tischler would compensate them by giving them 10 pounds of marijuana. The marijuana disappeared, and the Ballards said they "got nervous" and burned it, but they still wanted their 10 pounds. Tischler believed the

---

[2]Tischler also says the court erroneously excluded defense exhibit 22, a copy of a document showing that the Ballards had insurance on the property during a certain period of time. The trial transcript shows that the court did not exclude this exhibit, however; instead, it admitted the document for a limited purpose. Tischler does not argue that there was any error in the court's statement of the limited purpose.

14

Ballards took the marijuana and sold it in Oklahoma. This was why Tischler and the Ballards had their falling out. The court ruled that evidence of this agreement and the dispute to which it led shed only "minimal light in terms of relevance," was "extremely prejudicial," and would "totally confuse the issues as far as the jury [was] concerned." The court excluded the evidence under Evidence Code section 352.

Tischler now maintains that the ruling was erroneous. He says the trial court "allowed the entire history of the parties to be presented to the jury by the prosecution," and it was not fair to prevent him from "providing clarifying information" by presenting evidence of the agreement and the dispute over the marijuana. This evidence would have "provided the jury with the whole picture of the relationship" between Tischler and the Ballards. More specifically, the evidence would have shown that Tischler and the Ballards were in conflict not only over the property but also over the marijuana.

These arguments are not sufficient. Tischler does not explain any specific way in which the dispute over marijuana was relevant to the charge or defenses. It is not enough to say that the evidence would have provided a more complete picture of the reasons for the conflict between Tischler and the Ballards. To demonstrate reversible error, Tischler is required to show how it is reasonably probable that admitting the evidence would have helped him. He has not done so.

D. **Testimony regarding McMullen's actions in the courthouse**

Tischler argues that the trial court erred in allowing the prosecutor to question McMullen and Miller, the victim witness advocate, about McMullen's behavior toward Miller in the courthouse during the trial. He says evidence of the encounter between McMullen and Miller was "not relevant in any fashion to the issues in this matter at bar and was tendered solely for the purpose of tainting" Tischler. The evidence should have been excluded either as irrelevant or as substantially more prejudicial than probative under Evidence Code section 352, he contends.

In the trial court, Tischler made no objection to the questioning of McMullen and Miller on this topic. We ordinarily do not consider claims of error where an objection

15

could have been, but was not, made in some appropriate form at trial. It is usually unfair to the trial court and the adverse party to take advantage of an error on appeal that could have been corrected during the trial. (*People v. Saunders* (1993) 5 Cal.4th 580, 590; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1.) We conclude that Tischler has forfeited this issue by a failure to object.

Even if the issue had not been forfeited, we would not find any abuse of discretion. Evidence Code section 780, subdivision (d), allows the jury to consider, in determining a witness's credibility, the witness's "attitude toward the action in which he testifies or toward the giving of testimony." The trial court could reasonably find that McMullen's alleged behavior was evidence of his attitude toward the proceedings. The ill-mannered behavior to which Miller testified was not just any ill-mannered behavior. It was behavior in the courthouse, during the trial, directed toward a government official whose duty was to support a witness in the trial. The evidence of this behavior thus was relevant to McMullen's credibility as a witness. The court also did not abuse its discretion in finding that the probative value of the evidence of McMullen's behavior was not substantially outweighed by its prejudicial effect.

### DISPOSITION

The judgment is affirmed.

_____
Smith, J.

WE CONCUR:


_____
Detjen, Acting P.J.



_____
Peña, J.


16